**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>           **Plaintiff,**<br>           v.<br>**JAMES E. JOHNSTON,** *et al.,*<br>           **Defendants.** | **Case No. 2:11-cr-185**<br>**Judge Peter C. Economus**<br>**OPINION AND ORDER** |

This matter is before the Court for consideration of Defendant's Motion to Suppress Fruits of Illegal Stop and Unconstitutional Arrest (Dkt. 113), on which this Court held a hearing on September 26, 2012. For the reasons set forth below, the Court **DENIES** Defendant's motion.

**I.**  **Background**

On September 29, 2008, Utah State Trooper Charles Taylor initiated a traffic stop of a white Ford Crown Victoria in which Defendant James Johnston was a passenger and Defendant Karim Soto-Huerta was the driver. The traffic stop was based on Trooper Taylor's reported observation of two violations: (1) the vehicle's cracked windshield, which Trooper Taylor initially observed while he was refueling his car and observed more closely upon following the vehicle, and (2) both passenger side wheels of the vehicle crossing the road's solid white line and driving in the emergency lane. (Gov't Ex. 1 at 2 (Dkt. 119-1 at 1–5, hereinafter, "Police Report"); Hr'g Tr. 7–12.)

After pulling over the Crown Victoria, Trooper Taylor smelled a strong odor of air freshener and observed trash lying throughout the vehicle. In response to the officer's inquiry, Johnston informed him that the car did not belong to them, and provided registration indicating that the vehicle owner was Dennis Ross in Ohio. (Police Report at 3.)

Trooper Taylor asked Soto-Huerta to exit the vehicle and wait at the front of the patrol car. Trooper Taylor asked him where he was going and who the owner of the vehicle was. Soto-Huerta, who appeared to be overly nervous, stated that he owned a car dealership on the U.S. border, Dennis Ross owned a car dealership in Ohio, and Johnston had a dealership "where he was going to trade cars." Soto-Huerta stated that "he was trying to go to Ohio to possibly get some cars." (Police Report at 3; Hr'g Tr. 19.)

Trooper Taylor then returned to the Crown Victoria's passenger window and asked Johnston about the vehicle and the purpose of the trip. Johnston stated that he was a real estate agent and did not own a car dealership. He explained that Dennis Ross had sent him to Arizona to look at antique cars and to attend an auction. He stated that Dennis Ross owned a towing company, not a car dealership. (Police Report at 3.)

Trooper Taylor returned to his patrol car and requested information from the police dispatch regarding Johnston and Soto-Huerta's license status and criminal histories, among other information. While Trooper Taylor waited for this information and was in the process of completing a warning for the traffic violations, Soto-Huerta sat in the passenger seat of the police cruiser. At some point, Soto-Huerta told Trooper Taylor that he had met Johnston at an auction in Arizona. (Police Report at 3.)

While Trooper Taylor was in the patrol car, Sergeant Eldredge arrived to assist and apparently questioned Johnston. Sergeant Eldredge told Trooper Taylor that Johnston had stated that he and Soto-Huerta had met in Columbus and that Johnston was thinking of starting a car dealership. (Police Report at 3.)

Because the police dispatch informed Trooper Taylor that Soto-Huerta had a suspended Arizona license, and Johnston had a valid Ohio license, Trooper Taylor then informed Johnston

that he must drive the vehicle. He gave them the warning, the men thanked him, and they started to walk back toward the vehicle. (Police Report at 3.) Trooper Taylor reported:

> Based on the conflicting information given by both subjects, the strong cover odor in the vehicle, the prior drug history [as reported by the police dispatch] and the third party registration, I had made a decision to ask the occupants of this vehicle for a consent search. As both subjects walked away, I called out to James by name and asked if before he left if I could ask him some more questions. James stated "Yes, you may." I then asked James if they were doing anything illegal. James stated "No sir." James then stated "Your [sic] welcome to look." I followed that statement up with the question, "Can I search your car?" James stated, "I have no problem with that." I turned to Karim and told him that James had given me permission to search the car. I asked Karim if that was OK with him. Karim indicated that he was consenting to the search as well.

(Police Report at 3.)

A police canine was then walked around the vehicle and indicated something in the trunk, where the officers found empty duffle bags, duct tape, empty vacuum seal space saver bags, and a vacuum to seal the bags. After completing the search, Trooper Taylor thanked Johnston and Soto-Huerta for their cooperation and allowed them to leave. (Police Report at 3.)

Trooper Taylor testified that it took about ten to fifteen minutes to ask questions of Johnston and Soto-Huerta, including time spent waiting for information from the police dispatch, and another ten to fifteen minutes from the time of the consent to when they drove away. (Hr'g Tr. 14, 22.)

Based on the items they found in the trunk of the Crown Victoria, Trooper Taylor and Sergeant Eldredge believed that the car may have been a "follow/lookout vehicle." Trooper Taylor recalled that, while following the Crown Victoria, he had noticed a rental vehicle with South Dakota plates following in close proximity to it. He testified that he noticed this car

because the driver appeared to avoid eye contact with the officer as he passed, and sat far back so that he was "almost right behind the pillar . . . where the doorjamb is." (Police Report at 3.)

Acting on their advice, another trooper, Trooper Jones, spotted the rental vehicle, waited for a minor traffic infraction, and then pulled it over. (Police Report at 3.) The driver, Brian Ross, is the son of Dennis Ross, the registered owner of the Crown Victoria. The officers found over 100 pounds of marijuana in the rental vehicle. (*Id.* at 4.) The Crown Victoria was again stopped, and Johnston and Soto-Huerta were arrested. Among other evidence linking the two cars, Johnston's wallet contained a tally sheet with the weights of the packages of marijuana found in the rental vehicle. (Police Report at 4.)

Defendant moves to suppress all evidence resulting from the initial traffic stop, including the evidence found in the Crown Victoria, Johnston's statements to officers at the scene of the stop, "all other related evidence," and the marijuana seized from the rental vehicle "as the fruit of the poisonous tree." (Mot. 10–11.) Defendant argues that (1) the stop was impermissible because Trooper Taylor lacked reasonable suspicion of legitimate traffic violations, (2) Trooper Taylor impermissibly expanded the scope of the detention when he conducted a drug investigation, and (3) Johnson's consent was invalid because it followed a Fourth Amendment violation.[1]

## II. **Permissibility of Initial Traffic Stop**

Defendant first argues that "[t]he initial traffic stop was impermissible and all evidence flowing therefrom must be suppressed." (Mot. at 3.) Defendant asserts that "Trooper Taylor did not have reasonable suspicion that legitimate traffic violations occurred," and "the stop was an impermissible pretext to search for evidence of drug activity." (*Id.* at 5.)

---

[1] Defendant also argues that he has standing to challenge the subsequent search; the Government does not contest this. (Mot. at 5–7; Resp. at 8.)

4

The Fourth Amendment's protection against unreasonable searches and seizures applies to traffic stops, even when the stop is "only for a brief period and for a limited purpose." *Whren v. United States*, 517 U.S. 806, 809–10 (1996) (citations omitted). A traffic stop is "thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810 (citations omitted); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) ("so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment").

The parties agree that the initial traffic stop was premised on Trooper Taylor's reported observation of (1) the vehicle's cracked windshield and (2) the vehicle crossing the road's solid white line. They disagree as to whether Trooper Taylor had probable cause to believe a traffic violation occurred.

### A. <u>Cracked Windshield</u>

Defendant asserts, and the Government does not dispute, that the Utah law applicable to this traffic stop prohibited the operation of a vehicle with a windshield crack of 24 inches or more.[2] (Mot. at 5; Resp. at 6 (both citing *State v. Galvan*, 2001 UT App 329, P16 (Utah Ct. App.

---

[2] Utah Code Ann. § 41-6a-1601(1)(a) (2008) prohibits the operation of a vehicle which is in an unsafe condition or is not equipped in proper condition as required. The 2008 statutes include no requirements specifically applicable to windshield cracks, but § 41-61-1601(2) (2008) authorizes regulations "setting minimum standards covering the design, construction, condition, and operation of vehicle equipment for safely operating a motor vehicle on the highway as required under this part."

The 2008 regulations also lack requirements applicable to windshield cracks, but the 2008 version of the Official Vehicle Safety Inspection Manual for Passenger Vehicle and Light Duty Truck, published by the State of Utah Department of Public Safety, provides that a windshield cannot pass a safety inspection if it is cracked more than 1 inch in the "acute area," which is the part of the windshield more than 6 inches in from the outside edges. (This requirement is currently contained in state regulations at U.A.C. R714-160-13, which was enacted in 2011.)

However, neither party has briefed this issue, and both parties appear to assume that Utah law in effect in 2008 prohibited windshield cracks of 24 inches or more.

5

2001)). In *Galvin*, the Utah appellate court reversed the trial court's denial of a motion to suppress. "[A]nalyz[ing] the stop on the presumption that the 24 inch standard is the law in Utah regarding windshield cracks," the court "conclude[d] it was not reasonable of Trooper to believe that a windshield crack safety violation occurred based merely on Trooper's observation of a sparkle in the windshield." *Galvin*, 37 P.3d at 1200, 1201.

In his motion, filed without benefit of hearing testimony, Defendant stated that Trooper Taylor allegedly observed the vehicle's cracked windshield "from an unreported distance" and claims that "[t]here is no evidence that asserts the windshield was cracked 24 inches." (Mot. at 2, 5.)[3] Trooper Taylor testified at the hearing that he first observed what he believed to be a broken windshield as he was pumping gas, so he followed the Crown Victoria in his patrol car to get a closer look. As he was driving behind the vehicle, he could see through the back window and confirmed that the windshield was broken. (Hr'g Tr. at 17.) He testified that the windshield had a "large crack" that "was distinctly in the driver's view, and [he] believe[d] it was longer than 21 inches or 24, but it was longer than that, and it didn't meet the [Utah state] standards." (*Id.* at 16–17.)

Defendant's post-hearing brief addresses neither this testimony nor whether Trooper Taylor had probable cause to believe that a equipment violation had occurred. (Def. Post-Hr'g Br.) In fact, Defendant has offered no reason to disbelieve Trooper Taylor. Thus, the Court finds Trooper's Taylor's testimony to be credible and concludes that he had probable cause to believe that a equipment violation had occurred. Unlike the officer *Galvin*, who observed a mere sparkle in the windshield, Trooper Taylor was able to observe a large crack in the driver's view.

---

[3] Defendant makes no arguments as to this equipment violation in his post-hearing brief. (Def. Post-Hr'g Br..)

### B. Vehicle Crossing the Line

Trooper Taylor reported and testified that he observed the Crown Victoria "cross over the white line with [both] passenger side wheels and drive in the emergency lane." (Police Report at 2; Hr'g Tr. at 10.) He testified that the road was straight, level, dry, and in good condition. The weather was clear and the traffic light. The Crown Victoria was traveling at about 30-40 miles per hour in a 30 miles per hour zone. (Hr'g Tr. at 8–9, 30.)

In his post-hearing brief, Defendant argues that Trooper Taylor cited the wrong Utah statute in his warning. (Def. Post-Hr'g Br. at 3.) In the warning, Soto-Huerta is cited for two violations: the faulty windshield and "unsafe lane travel," for which § 41-6a-804(1)(a) is cited. (Govt. Ex. 3 (Dkt. 119-1 at 7).) Defendant asserts that § 41-6a-804(1)(a) pertains to turning and signaling for turns; "[t]hus, the stated premise for the stop is flawed." (Def. Post-Hr'g Br. at 3.) The 2008 version of § 41-6a-804(1)(a) provides that "[a] person may not . . . move right or left on a roadway or change lanes until: (i) the movement can be made with reasonable safety; and (ii) an appropriate signal has been given."

In another case applying Utah law, where a trooper observed the defendants drift into the emergency lane, the Tenth Circuit found that the trooper thereby observed the defendants committing a traffic violation under two provisions of Utah law: former § 41-6-69(1)(a), which provided that "[a] person may not turn a vehicle or move right or left upon a roadway or change lanes until . . . an appropriate signal has been given" (analogous to § 41-6a-804(1)(a), prohibiting unsafe lane travel), and former § 41-6-61(1), which required that "[a] vehicle shall be operated as nearly as practical entirely within a single lane." *United States v. Parker*, 72 F.3d 1444, 1449 (10th Cir. 1995).

Before the warning was entered on the record, both parties' briefing focused on Utah Code § 41-6a-710(1)(a)(i) (formerly numbered § 41-6-61), which requires a driver to "keep the vehicle *as nearly as practical* entirely within a single lane." (Emphasis added). In both his motion and post-hearing brief, Defendant cites *United States v. Gregory*. In *Gregory*, the Tenth Circuit held that, where "[t]he road was winding, the terrain mountainous and the weather condition was windy," "an isolated incident of moving into the right shoulder of the roadway" does not give rise to reasonable suspicion of criminal activity under Utah law. *United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996) (citing *State of Utah v. Bello*, 871 P.2d 584, 586 (Utah App. 1994) (*Bello* holding that a single incident of weaving under "extreme wind conditions" was not a violation)). In both *Gregory* and *Bello*, the statutes at issue were analogous to current Utah Code § 41-6a-710(1)(a)(i), requiring a driver to stay as nearly as practical within a single lane, and in both cases, the driving conditions were such that it may not have been practical to expect the driver to keep the vehicle entirely within a single lane.

The Court credits Trooper Taylor's testimony and concludes that, as in *Parker*, Soto-Huerta apparently violated both § 41-6a-804(1)(a), which was cited in the warning, and Utah Code § 41-6a-710(1)(a)(i), which was heavily briefed by the parties. Because the Crown Victoria crossed the white line on a straight road in optimal driving conditions, this case can be distinguished from *Bello* and *Gregory*. The fact that the warning cites only one of the applicable statutes, rather than both, does not render "the stated premise for the stop . . . flawed." (Def. Post-Hr'g Br. at 3 (claiming that the warning "cites an improper Utah statute").)

The Court concludes that Trooper Taylor had probable cause to suspect two separate violations, an equipment violation and a lane violation, either of which alone would be sufficient

to justify the traffic stop. Therefore, the Court finds that the stop did not violate the Fourth Amendment.

## III. Permissibility of Drug Investigation

Defendant argues that Trooper Taylor impermissibly expanded the scope of the detention when he conducted a drug investigation. (Mot. at 7.)

### A. Before the Warning Was Issued

The Court analyzes the reasonableness of Trooper Taylor's conduct in effectuating the traffic stop under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (citing *United States v. Hill*, 195 F.3d 258, 263–64 (6th Cir. 1999), cert. denied, 528 U.S. 1176 (2000)). "'In evaluating the constitutionality of a *Terry* stop, . . . [w]e first ask whether there was a proper basis for the stop,'" and if so, "we ask 'whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.* (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). "[I]f 'something happen[s] during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot,'" the officer "may extend a stop beyond the scope of what was originally permissible." *Id.* (quoting *Davis*, 430 F.3d at 353. Otherwise, "all the officer's actions must be 'reasonably related in scope to circumstances justifying the original interference.'" *Id.* (quoting *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002)).

"An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citing *Muehler v. Mena*, 544 U.S. 93, 100–01 (2005). "A traffic stop is not 'measurably'

extended by extraneous questioning even when such questioning undeniably prolongs the stop to a minimal degree." *United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012) (citing *United States v. Everett*, 601 F.3d 484, 492 (6th Cir. 2010)). To "evaluate the reasonableness of the prolonging of a stop," the Court "consider[s] the totality of the circumstances . . . [including] both the duration of the extraneous questioning and its subject matter." *Id.* (citing *Everett*, 601 F.3d at 494). Permissible subject matter includes "questions relating to travel plans, the driver's authority to operate the vehicle, [and] the safety of the officer." *Id.* (citing *Everett*, 601 F.3d at 494–95).

As noted above, Trooper Taylor testified that it took about ten to fifteen minutes to ask questions of Johnston and Soto-Huerta, including time spent waiting for information from the police dispatch, prior to issuing the warning. (Hr'g Tr. 14, 22.) The Court finds Trooper Taylor's testimony to be credible and concludes that his questioning before the issuance of the warning did not "measurably extend the duration of the stop."

### B. After the Warning Was Issued

Defendant also apparently challenges Trooper Taylor's questioning after the warning was issued. Defendant claims that, "[a]lthough the Trooper . . . had returned the Defendant's license and paperwork to him, and allowed him to walk toward his car prior to asking for a consent to search, Mr. Johnston still was not free to leave."[4] (Def. Post-Hr'g Br. at 6–7.)

The Sixth Circuit has held that "police officers do not violate the Fourth Amendment by asking an individual questions after the initial stop has ended." *United States v. Branch*, 537 F.3d 582, 588 (6th Cir. 2008) (citing *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998)).

---

[4] Defendant also claims, without any supporting argument, that Defendant "was also further detained when the officers continued to follow him for over an hour and for a distance of 62 miles." (Def. Post-Hr'g Br. at 7.) The Court need not address this claim, but the evidence suggests that Sergeant Eldredge followed the vehicle "at a distance," without "maintain[ing] continuous visual contact," and apparently with the intention of following "far enough that they didn't know he was back there until we knew what we had." (Tr. at 24, 44.)

10

In fact, "law enforcement officers may ask citizens 'general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave.'" *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. Tenn. 2008) (citing *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir. 2000); *United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004)). There is no evidence that Trooper Taylor engaged in any intimidating behavior.

As in *Branch*, "[b]ecause [Defendant] was not seized within the meaning of the Fourth Amendment, [Trooper Taylor] did not need any reasonable suspicion to ask him further questions." *Branch*, 537 F.3d at 588. The Court finds no Fourth Amendment violation in Trooper Taylor's further questioning following the issuance of the warning.

### IV. <u>Validity of Consent</u>

Defendant argues that his consent to search the Crown Victoria was invalid because it "was elicited following a violation of the Defendant's Fourth Amendment rights." (Mot. at 9.) Because no Fourth Amendment violation occurred during the initial traffic stop, as discussed above, this argument fails. Defendant makes no other arguments on this issue. (*See* Mot. at 9–10, Def. Post-Hr'g Br.) The Court credits Trooper Taylor's testimony regarding consent and finds Defendant's consent to be valid.

### V. <u>Conclusion</u>

Defendant seeks to suppress the evidence found in the Crown Victoria, Johnston's statements to officers at the scene of the stop,[5] "all other related evidence" resulting from the initial traffic stop, and the marijuana seized from the rental vehicle "as the fruit of the poisonous tree." (Mot. 10–11.) Because the Court finds that the initial traffic stop, Trooper Taylor's conduct during the stop, and the search were all appropriate under the Fourth Amendment, the

---

[5] Defendant has identified no specific statements.

evidence obtained during that stop will not be suppressed. Moreover, because no Fourth Amendment violation occurred, there is no illegality constituting a "poisonous tree," and the evidence obtained from the rental vehicle need not be suppressed as its "fruit." *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Segura v. United States*, 468 U.S. 796 (1984). For the reasons set forth above, the Court hereby **DENIES** Defendant's Motion. (Dkt. 113.)

    **IT IS SO ORDERED.**

                                           **/s/ Peter C. Economus - October 12, 2012**
                                           **UNITED STATES DISTRICT JUDGE**